KEVIN JAMES KEKOA, a Minor, by CATHERINE KEKOA ENOMOTO, His Next Friend, et al., Plaintiffs-Appellants, *v.* SUPREME COURT OF HAWAII, et al., Defendants-Appellees

In the Matter of the Estate of
BERNICE PAUAHI BISHOP, Deceased

NO. 5215

NOVEMBER 28, 1973

CIRCUIT JUDGE ALLEN R. HAWKINS, Presiding
Justice, in place of RICHARDSON, C.J.,
recused CIRCUIT JUDGE THOMAS S. OGATA
in place of MARUMOTO, J., recused,
CIRCUIT JUDGE ALFRED LAURETA in place
of ABE, J., recused, CIRCUIT JUDGE
HERMAN T. F. LUM in place of LEVINSON, J.,
recused, and CIRCUIT JUDGE JOHN C. LANHAM
in place of KOBAYASHI, J., recused.

*Per Curiam.* On June 18, 1971, the Justices of the Supreme Court of Hawaii, acting pursuant to the provisions of the fourteenth article of the will of Bernice Pauahi Bishop,

appointed Matsuo Takabuki as trustee of the Bernice Pauahi Bishop Estate trust in order to fill a vacancy created by the death of trustee Herbert K. Keppeler. The relevant portion of the fourteenth article of the will, under which the Justices acted, and concerning which the appellants present several issues of law, is as follows:

> I further direct that the number of my said trustees shall be kept at five; and that vacancies shall be filled by the choice of a majority of the Justices of the Supreme Court, the selection to be made from persons of the Protestant religion.

On July 22, 1971, a civil complaint was filed in the First Circuit Court, challenging the appointment of Mr. Takabuki on the several legal grounds discussed, *infra*. Simultaneously with the filing of the civil complaint, plaintiffs moved to intervene in the equity proceedings relating to the Bishop Estate trust to enjoin the vesting of title to the trust property in Mr. Takabuki, jointly with the other trustees. Because the questions presented in the equity motion were similar to, or inextricably interrelated with, those in the civil action, the cases were consolidated.

In connection with the complaint, the plaintiffs sought a preliminary injunction to stay the confirmation or vesting of Mr. Takabuki as trustee. The court denied the motions for a preliminary injunction and for intervention, and granted motions, filed by the named defendants, to dismiss the civil complaint. The complaint has named as defendants the Supreme Court of Hawaii, each of the five Justices of the court as individuals, each of the four continuing trustees as individuals, and the Attorney General. Since the plaintiffs had not joined Mr. Takabuki as defendant, the court dismissed the complaint on the ground that plaintiffs had failed to join an indispensable party. H.R.C.P., Rules 19 and 12(b)(7).

The court also dismissed the complaint on the further ground that it failed to set forth a claim for relief, H.R.C.P., Rule 12(c).

On August 4, 1971, the date when the court issued the vesting order in the equity proceeding, an amended

complaint was filed adding three additional plaintiffs, deleting the Supreme Court as defendant, and designating Mr. Takabuki as an additional defendant. On the same day, plaintiffs filed objections to orders, together with a motion to strike orders, which had been filed by defendants pursuant to the previous oral rulings of the trial court dismissing the civil complaint and denying the motion to intervene in the equity proceeding. Defendants opposed the motion and objections, and moved to strike the amended complaint. The court ruled for defendants and a written order was entered on August 24, 1971. On August 27, 1971, plaintiffs filed a notice of appeal from all of the above adverse rulings by the trial court.

Pursuant to a motion for Disqualification of Justices of the Supreme Court and Selection of Alternate Justices, the five defendant-appellee Justices of the Supreme Court filed certificates of recusal on October 1, 1971. *Kekoa v. Supreme Court of Hawaii*, 53 Haw. 174, 488 P.2d 1406 (1971). On October 5, 1971, orders filed by the Chief Justice designated us to sit as substitute justices.

The amended complaint filed by plaintiffs does not present any issues of substantive law not also presented in the original complaint. Since the original complaint was dismissed not only because of failure to join Mr. Takabuki, but also under the provisions of Rule 12(c), if the decision of the trial court was correct in dismissing the original complaint, then it would not be reversible error for the trial court to have granted the motion to strike the amended complaint. We turn to the important substantive issues presented by the plaintiffs' complaints.

I.

Appellants first argued that the method of selection of Mr. Takabuki as trustee, although according to the provisions of the will of Bernice Pauahi Bishop, is in violation of the U.S. Const., 14th Amendment and of the Hawaii Const., Art. I, § 4. More specifically, appellants argue that appointment of trustees for the Bishop Estate trust is "state action," and that, therefore, the appointment is subject to the procedural

due process guarantees of notice to interested parties and meaningful preselection hearings. *See generally, Brunswick Corporation v. Galaxy Cocktail Lounge,* 54 Haw. 647, 513 P.2d 1390 (1973); *Freitas v. Gomes,* 52 Haw. 145, 152, 472 P.2d 494, 498 (1970); *Sniadach v. Family Finance Co.,* 395 U.S. 337 (1969); *Goldberg v. Kelly,* 397 U.S. 254 (1970). Since, as is conceded, neither notice nor formal opportunity to be heard were given, appellants argue that the appointment was constitutionally defective and hence void.

In evaluating the need for the procedural due process guarantees, the threshold issue is the character of the trustee selection process and of the functions of the Bishop Estate trust. Unless essentially governmental functions are involved in substance, whatever the form, the constitutional provisions that protect a citizen against arbitrary action of his government would not be applicable. For over fifty-five years the law on one of these issues has been clear. In *Estate of Bishop,* 23 Haw. 575, 581-82 (1917), *aff'd,* 250 F. 145, 149-50 (9th Cir 1918) the testamentary provisions here at issue were authoritatively interpreted as delegating the power of appointment to the Justices not as a court, but as individuals. *See, Estate of Carter,* 24 Haw. 536, 538-39 (1918).

Devising an adequate definition of "state action" is an extremely difficult task. *See, Aluli v. Trusdell,* 54 Haw. 417, 422-25, 508 P.2d 1217, 1220-22 (1973); *Evans v. Newton,* 382 U.S. 296, 299 (1966). Appellants have indicated "obvious" indicia of alleged governmental involvement in the trustee selection process and in the functions of the Bishop Estate trust, and have also alleged "non-obvious involvement of the State" therein in order to prove "state action." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722 (1961). *Cf. In re Estate of Bishop,* 53 Haw. 604, 608-16, 499 P.2d 670, 673-77 (concurring opinion of Abe, J.). Certainly the unique aspects of the Bishop Estate trust — its size, mission, status within the state, and role in the history of the Hawaiian Islands — have made the issue still more complex.

However, even under the very recent and innovative expansions of the rights to procedural due process in non-criminal matters, we are constrained to hold that even if

the trustee selection process or the functions of the Bishop Estate trust may be "state action," appellants have been deprived of no constitutional rights. The crucial issue is the interpretation of the well-known constitutional language that no state shall deprive any person

> . . . of life, liberty, or property, without due process of law . . . .

U.S. Const., 14th Amendment; Haw. Const., Art. I, § 4. It is obvious that appellants have lost neither "life" nor "liberty," and we think that it is equally clear that there has been no deprivation of "property."

For purposes of due process procedural fairness, protection is obviously appropriate for such "property" as wages, *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969), and chattels possessed on conditional sales contract, *Fuentes v. Shevin*, 407 U.S. 67 (1972). But palpability has not been the touchstone in the test for applicability of due process standards under the "property" concept, for the procedural guarantees have also been held to be constitutionally required prior to suspension of "important interest[s]" such as a driver's license, *Bell v. Burson*, 402 U.S. 535, 539 (1971). There is also potent authority for applicability of the guarantees whenever there is deprivation under a "legitimate claim of entitlement" to benefits under state law or regulation, *Perry v. Sindermann*, 408 U.S. 593, 602 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Goldberg v. Kelly*, 397 U.S. 254 (1970). The "legitimate claim of entitlement" test seems to have been stretched so far as to include deprivation of benefits from government if claimed under a "clearly implied promise." *Board of Regents v. Roth*, *supra* at 577, citing, *Connell v. Higginbotham*, 403 U.S. 207, 208 (1971).

The "property" right that appellants claim to have lost, or may lose, through the appointment of Mr. Takabuki[1] as trustee is nowhere particularized.

---

[1] The book *Men and Women of Hawaii 1972*, being "A biographical directory of noteworthy men and women of Hawaii", edited by Betty Finley Buker and published by Star-Bulletin Printing Company, Inc., after describing Matsuo Takabuki as an attorney at law and estate trustee, gives the following information:

At best, appellants' contention that beneficiaries of a charitable trust have a "property" right in the trustee selection process is a novel argument. The black letter law is, without ambiguity, quite to the contrary. When the settlor designates a method for filling vacancies in the office of trustee, the method designated is the only method to be utilized. Restatement (Second) of Trusts, §§ 388, 108 and Comments (f) and (i); A. Scott, Trusts, § 388. Under traditional trust law appellants have no "property" or other right to participate in the choice of a new trustee, contrary to the wishes of the settlor.

Nor does appellants' interest in the appointment process or in the identity of the appointee-trustee amount to a "property" right under any of the constitutional tests set forth, *supra*. There is, and can be, no "clearly implied promise" to appoint a person meeting the subjective hopes of any particular beneficiary or member of the public. Appellants have no "legitimate claim of entitlement" to the choice of any individual, or kind of individual, as trustee. It has been held that far more than an "abstract need or desire for" or "unilateral expectation of" a benefit must be shown. *Board of Regents v. Roth, supra* at 577. A "mere subjective 'expectancy' " is not protected by due process. *Perry v. Sindermann, supra* at 603.

Any "important interests" that appellants, or any of them, may have as beneficiaries under the will certainly should not vary as contingent on the identity of the trustee.

He was born at Haleiwa, Oahu on February 25, 1923, being the son of Matsuzo and Misao (Kurihara). He married Ayako Saiki on January 23, 1946, and has three children. He graduated Waialua Intermediate and High Schools in 1940, and attended the University of Hawaii 1940-43. He received the Doctor of Jurisprudence Degree from the University of Chicago in 1949; from 1949-1952 he was an attorney with the Territory of Hawaii Department of Labor, and has been in the private practice of law since 1952. From 1953-1971 he served as a member of the Board of Supervisors and City Council of the City and County of Honolulu. He served with the U.S. Army as a member of the 442nd Combat Team from 1943-1945. He was a Trustee of the Palama Settlement from 1961-1965. Other mentioned association activities are membership in the American and Hawaii Bar Associations, the American Cancer Society (Hawaii Drive Chairman, 1954), Aloha United Fund (executive campaign committee 1965), Democratic Party (Chairman 1956 State Convention), 442nd Veterans Club (1952 President). His residence and office addresses are in Honolulu, Hawaii.

We will not anticipate post-appointment grievances. Trustee action may be challenged in the usual and proper manner in the circuit courts under the strict fiduciary and other standards applicable to all trustees. All we decide here is that there is no due process infirmity in the selection process itself.

II.

Appellants next argue that the exercise of the power of appointment under the will of Bernice P. Bishop is in violation of the 1968 Hawaii Constitution. We cannot agree.

Hawaii Constitution, Art. V, § 3, on which appellants rely, provides in pertinent part:

> No justice or judge shall hold any other office or position of profit under the State or the United States.

Only if holding the power of appointment under the will could be construed as an "office or position of profit under the State or United States" does this cited provision become applicable. We think that it would strain credibility to hold that exercise of a testamentary power of appointment is covered by the meaning of this constitutional provision.

However one may define "office or position of profit," the concept obviously could not include powers of appointment where no remuneration or compensation is to accrue to the holder of the power. The constitutional provision upon which appellants rely tracks the language of the provision in the 1950 Constitution and was adopted without argument or proposed amendment. See 2 *Proceedings of the Constitutional Convention of Hawaii of 1968* (1972), September 4, 1968, pp. 369-70. In 1950, the provision was adopted as written, and was explained during debate as permitting a judge or justice to accept a position on a board or commission so long as it be "without pay." 2 *Proceedings of the Constitutional Convention of Hawaii (of 1950)* (1960), June 8, 1950, p. 371; 1 *Proceedings of the Constitutional Convention of Hawaii (of 1950)* (1960), "Standing Committee Report No. 37," p. 174.

In other jurisdictions, interpretations of similar

phraseology have been in accord: *Opinion of the Justices*, 283 Ala. 341, 217 So. 2d 53 (1968); *Baker v. Board of Commissioners of Crook County*, 9 Wyo. 51, 59 Pac. 797 (1900). Since no compensation whatsoever is provided for the exercise of the power of appointment of Bishop Estate trustees, we hold that such exercise is not within the constitutional prohibition against the simultaneous holding of an "office or position of profit" and the holding of the office of Hawaii Supreme Court Justice.

Appellants' argument that the disjunctive "or" between "office" and "position" should be read in the context of the constitutional provision as prohibiting the holding not of an "office . . . *of profit* under the State or United States" but of *any* "office . . . under the State or United States" is not well-taken, for two reasons. The debates and committee report, *supra*, both show that the delegates to the Constitutional Convention understood the provision here at issue to prohibit the holding of "offices . . . *of profit*" and not to prohibit the holding of *all* "offices . . . under the State and United States." Secondly, even if we accept appellants' arguments that the Bishop Estate trust is "affected with a broad public interest," it would not therefore follow, as has been argued, that the holder of the power to appoint its trustee is thereby made an officer of the State. Appellants overlook the fact that every charitable trust is affected with some broad public interest; yet, this factor has never been reason to rule the holders of a power to appoint trustees of such a charitable trust become, thereby, public officials.

Appellants suggest an additional reason for, and meaning of, Article V, § 3, Hawaii Constitution, assuming *arguendo* that it could apply to the nonremunerative exercise of the power of appointment in this case. It is argued that Article V, § 3 represents a policy decision, of constitutional magnitude, that the people of Hawaii seek to preserve the energy and working hours of judicial officers for judicial tasks. Such an argument was one of those relied upon by the New York Court in interpreting a similar New York constitutional provision. *In re Richardson*, 247 N.Y. 401, 420-21, 160 N.E. 655, 661 (1928). While we may personally and generally agree with this

laudable objective, we find no authority that will substantiate our attributing to Article V, § 3, a meaning that would effectively bar members of the Judiciary from undertaking tasks that may be in the public interest, though not within the precise purview of a designated judicial office. We note that the duties held to be unconstitutionally delegated in *In re Richardson, supra,* were extremely onerous and not at all comparable to the rare exercise of the power of appointment involved in this case. Moreover, one delegate to the Constitutional Convention of 1950 absolutely objected to the constitutional provision's being enacted if its terms would permit any remunerative or nonremunerative service of any kind on boards or commissions; he argued that such service would necessarily demand an undesirable division of the "time and effort" of the serving member of the Judiciary. Since the provision was approved as written, the objecting delegate was clearly stating a minority position which never became law. *Proceedings of the Constitutional Convention of Hawaii (of 1950)* (1960), June 8, 1950, p. 371.

We note parenthetically that the public interest has occasionally required the time and talents of such high judicial officials as Justices of the Supreme Court of the United States, acting outside of, and independent of, the functions of their offices. For some instances of nonjudicial activity on the part of U.S. Supreme Court Justices and lower court judges, together with a discussion of the problems and benefits involved, see Mason, *Extra-Judicial Work for Judges: The Views of Chief Justice Stone,* 67 Harv. L. Rev. 193 (1953); H. M. Hart and H. Wechsler, *Note on Extra-Curricular Activities of Federal Judges,* The Federal Courts and the Federal System, pp. 102-05 (1953). *Cf.* 20 U.S.C. §§ 42, 72. These authorities indicate that members of the American judiciary have repeatedly served in important nonjudicial posts because of the public need. Exercise of the power of appointment of trustees to the Bishop Estate trust is well within sound traditional perimeters.

III.

Finally, appellants argue that the appointment of Mr.

Takabuki violates the Canons of Judicial Ethics, to which the five defendant Justices of the Supreme Court of Hawaii are made subject by Rule 19 of the Rules of the Supreme Court of the State of Hawaii. We note at the outset that even if we were to hold that certain Canons had been violated, such a holding would not necessarily be grounds for invalidating the appointment, whatever other consequences might thereby follow, in that appellants have shown no violation of any constitutional right despite their strenuous contentions evaluated in Parts I and II.

Nevertheless, assuming *arguendo* that the Canons are relevant to this action, we have carefully evaluated appellants' arguments; however, we decline to adopt any of them. To some extent these arguments overlap those presented by appellants in arguing their position on the relevancy of Art. V, § 3, Haw. Const., especially as to use and conservation of the time and talents of members of the Judiciary. See Canons 23, 26 and 33. We have discussed these contentions *supra*, Part II, and here need only reiterate that the public interest often justifies members of the Judiciary in performing nonjudicial tasks, so long as the nature of such tasks is not overwhelmingly burdensome. *In re Opinion of the Justices*, 307 Mass. 613, 621-22, 29 N.E.2d 738, 743-44 (1940).

But appellants also rely on Canons 23, 26, and 33, together with Canons 1 and 4, in order to press an argument that the appointment process was defective because of an "appearance of impropriety," in that (1) because judges are ethically precluded from reviewing their own acts, there would be an appearance of impropriety if the defendant Justices were to review the validity of the appointment process; and (2) because it is "unseemly" for a justice to pass on the acts of trustees he has appointed, there would be a second instance of an appearance of impropriety.

(1) The first contention as to appearance of impropriety has been mooted by the certificates of recusal filed by the defendant Justices. Moreover, under Article V, § 2, Haw. Const., circuit court judges can be appointed to replace recused or disqualified justices, as has been done in this case.

114

We take judicial notice of the fact that the provisions of Article V, § 2 are frequently implemented, precisely in order to avoid any appearance of impropriety.

The fact that the defendant Justices felt the need to file certificates of recusal no more renders unethical their exercise of the Bishop Estate trust appointment power than would the filing of a certificate of recusal or disqualification render unethical either a justice's prior private participation in a business enterprise later present on appeal before the court, or a family or other relationship with an attorney present to argue before the court. Certificates of recusal and disqualification and Article V, § 2, are the methods available for avoiding any appearances of impropriety. So long as these methods are available and utilized, to hold that the exercise of the power of appointment of trustee for the Bishop Estate trust is *per se* unethical because of an appearance of impropriety would truly be using the anvil to kill the fly.

(2) There is no appearance of impropriety in the appointment mechanism, despite appellants' argument that it is "unseemly" for a justice to pass on the acts of his own appointees. *Cf. Hobson v. Hansen,* 265 F. Supp. 902, 919 at 930-32 (D.D.C. 1967) (dissenting opinion of Wright, J.) *appeal dismissed,* 393 U.S. 801 (1968).

Appellants' argument is well-taken, but only up to a point, because necessity often compels judges and justices to hear cases in which they have an interest. In some instances, even direct, individual, personal, and financial interest have not disqualified judges from hearing a case because of the exigencies of the situation. *Evans v. Gore,* 253 U.S. 245, 247 (1920); *Gordy v. Dennis,* 176 Md. 106, 109, 5 A.2d 69, 70 (1939); *Long v. Watts,* 183 N.C. 99, 102, 110 S.E. 765, 767 (1922); *Poorman v. State Board of Equalization,* 99 Mont. 543, 545, 45 P.2d 307, 308 (1935); *Girard v. Defenbach,* 61 Idaho 702, 706, 106 P.2d 1010, 1011 (1940); *Loughran v. F.T.C.,* 143 F.2d 431, 433 (8th Cir. 144); *New Jersey St. Bar Ass'n v. New Jersey Ass'n of Realtor Boards,* 118 N.J. Super 203, 287, A.2d 14, 18 (1972). Moreover, here, the personal interest of the defendant Justices is considerably more attenuated than in the above cases, in that it is only the same

interest as that of any other resident of the State of Hawaii in any charitable trust with a general public purpose.

Although case authority on the instant issue is sparse, where disqualification of a judge has been urged solely on the grounds that he should not sit in review on the acts of his own appointees, most authority hold that a judge is not disqualified from reviewing the acts of his appointees, unless some indication of the judge's "direct, certain, or immediate" interest is shown, beyond whatever speculative interest, if any, inheres in having originally made the appointment of the litigant whose action is being challenged. *Siemer v. Schuermann Building & Realty Co.*, 381 S.W.2d 821, 829 (Mo. 1964); *Miller v. City and County of Denver*, 63 Colo. 389, 167 Pac. 769 (1917) (dictum); *Hobson v. Hansen*, 265 F. Supp. 902, 918-19 (D.D.C. 1967) (semble), *appeal dismissed*, 393 U.S. 801 (1968); *cf.* Annot., 10 A.L.R.2d 1307, 1339 (1950). In fact, there is state statutory authority for the proposition that judges can review the acts of trustees appointed by them. Compare, H.R.S. §§ 554-1 and 554-4.

Finally, we note some of the past instances of legal disputes, both among the trustees *inter sese* and with third parties, in which the actions or legal contentions of some or all of the Bishop Estate trustees have been reviewed by the Supreme Court of Hawaii and have been held invalid or improper, in whole or in part. *Midkiff v. Kobayashi*, 54 Haw. 299, 507 P.2d 724 (1973); *Kaiser Hawaii-Kai Development Co. v. Murray*, 49 Haw. 214, 412 P.2d 925 (1966); *Richards v. Midkiff*, 48 Haw. 32, 396 P.2d 49 (1964); *Bishop Estate Trust v. Castle & Cooke*, 45 Haw. 409, 368 P.2d 887 (1962); *Estate Bernice P. Bishop*, 37 Haw. 111 (1945); *Collins v. Hodgson*, 36 Haw. 334, 339 (1943). *See also: In re Trustees Under Will and of the Estate of Bernice P. Bishop, Dec.*, 16 Haw. 804 (1905). A roughly equivalent number of cases has been decided in favor of the trustees. While we do not think that this kind of judicial history is dispositive on the issue of "appearance of impropriety," where appellants have failed to indicate any instance of the alleged appearance of impropriety, we can only note that we can build no presumptions on the basis of the above history of judicial review of Bishop Estate trustee

action, and that certainly no appearance of impropriety is shown on the record and posture of the case now before us.

Appellants' references to Canons of Judicial Ethics, Canons 13, 16, 17, and 25 are irrelevant, because, as to Canons 13 and 25, there is no intimation of kinship, influence, or personal investment by the defendant Justices, and because, as to Canons 16 and 17, there is no judicial action involved herein.

Appellants' other contentions need not be discussed since our answers to the above substantive questions dispose of this case. We can find no error in the ruling of the trial court.

Affirmed.

*Samuel P. King (Thomas Gill, Thomas Pico, Edward Kemper, Allan Haley* and *Arthur K. Trask* of counsel) for plaintiffs-appellants.

*Walter G. Chuck (Chuck & Fujiyama* of counsel) for defendants-appellees, *William S. Richardson*, et al.

*J. Garner Anthony (Anthony, Hoddick, Reinwald & O'Connor* of counsel) for defendants-appellees, *Frank Midkiff*, et al.

*Bertram T. Kanbara*, Special Deputy Attorney General, for defendant-appellee, *George T. H. Pai*.

### LANHAM, CIRCUIT JUDGE, CONCURRING

I agree with the statement of facts and the summary of the prior court actions taken in this case, as set forth in the majority opinion.[1] I also concur in the majority opinion, except that, in my opinion, it failed to dispose of one of the important issues on this case. That issue is slightly touched upon in the portion of the majority opinion which reads as follows:

---

[1] (a) It should be added that the purpose of the trust is to erect and maintain in Hawaii one school for boys and one for girls, and further that a portion of the income of the trust would be used for the support and education of orphans and other indigents, preference to be given to Hawaiians of pure or part aboriginal blood.

(b) An additional former plaintiff, an association known as The Hawaiians, withdrew from this appeal and appealed to the U. S. Supreme Court, which petition was dismissed by that court in a *per curiam* decision on December 14, 1971. *Pae Galdeira and the Hawaiians v. Richardson*, et al, 404 U.S. 993, reh. den. 405 U.S. 948.

" . . . Trustee action may be challenged in the usual and proper manner in the circuit courts under the strict fiduciary and other standards applicable to all trustees. All we decide here is that there is no due process infirmity in the selection process itself."

One of the contentions urged by the appellants in their appellate brief was that inasmuch as the appointment of the successor trustee in this case bore not only the signatures of all the justices, but also bore the official seal of the supreme court and was first filed in the supreme court, that the probate judge, in being presented with such a document, would believe that the supreme court itself, and not the members thereof as individuals, had made the appointment. This coupled with the decisions of *Estate of Bishop*, 23 Haw. 575, *aff'd*, *King v. Smith*, 250 Fed. 145, (9th Cir. 1918) could leave the probate judge with the impression that such an appointment by the supreme court justices is non-reviewable by the circuit court in probate.

While I do not agree with appellants that the affixing of the supreme court seal to the appointment means that the appointment is "state action", rather than a technical procedural error, nevertheless, the appellants' argument presents an issue which should be decided. I also believe that to decide this issue of what powers the circuit court in probate has over such an appointment once received is not only necessary to this case, but that such decision will prevent uncertainty and litigation on the same point in the future.

The validity of this will, insofar as the appointment powers of the justices of the supreme court are concerned, has already been interpreted in *Estate of Bishop*, 23 Haw. 575, 581-2 (1917), *aff'd*, 250 Fed. 145, 149-50 (9th Cir. 1918), wherein it was held that such powers of appointment of trustees to fill vacancies were conferred upon the justices, as individuals, and not as a court. Where such an interpretation is made the power is not null and void or violative of law. 90 C.J.S. *Trusts* § 213a, *In re John's Will*, 30 Ore. 494 (1896) 47 Pac. 341. Had the courts in the cases of *Estate of Bishop*, *supra*, interpreted the will as conferring such appointive powers on the justices in their official capacities such a

provision would be null and void inasmuch as court jurisdiction cannot be conferred or changed by the provisions of a will. 90 C.J.S. *Trusts* § 213a, Bogert, Trusts and Trustees, § 532, at 410 (2d ed.); *Leman v. Sherman*, 6 N.E. 872, 117 Ill. 657 (1886); *Harwood v. Tracy*, 24 S.W. 214; 118 Mo. 631 (1893); *Petition of Straw*, 102 Atl. 628; 78 N.H. 506 (1917); *Estate of Carter*, 24 Haw. 536 (1918). Insofar as these decisions, although they were made fifty-three years ago, conclude that the supreme court justices, as individuals (and not as a court) have the power to select, nominate and appoint the successor trustees of Mrs. Bishop's estate, as was her expressed intention,[2] I concur. Of course, the individual justices may decide as individuals not to exercise such powers, or the supreme court by rule, or the legislature by statute, may terminate such procedure, but as the law now stands I see no impediment to such an appointing process by the justices as individuals. The problem arises, however, from the following portions of the decisions in *Estate of Bishop, supra,* and *King v. Smith, supra,* which seem to say that the supreme court justices' appointment, even though made as individuals, may not be subject to review by the circuit court judge in probate.

Thus in *King v. Smith,* 250 Fed. at 149, we find the following:

"Further, the power of appointment, when exercised, is final. The vacancy or vacancies, whatever they may be, are filled by the act. The process of appointment ends there, and no court has authority, except for just cause for removal, to disturb the appointment; that is to say, no court has authority or power to review or supervise the appointment made by the justices."

And in *Estate of Bishop,* 23 Haw. 575 at 583, the court stated:

" . . . The will does not provide that the choice or appointment made by the justices of this court should be

---

[2] Courts, judges and justices are most reluctant to set aside, or hold non-effective, the provisions of a person's last will and testament, especially where made with the kind, loving and generous motives with which this one was obviously made. (See 5 Page on Wills, § 41.7, at 185-7).

subject to the approval or consent of any other officer or tribunal. The power of approval implies the power or right of disapproval — the power of vetoing the act of the justices of this court in exercising the power of appointment — and such veto power, if exercised as attempted by the learned circuit judge, would necessarily result in defeating the intent of the testatrix as expressed in the provisions of her will under consideration. The only proper petition to the circuit judge would be one asking that he name the amount of the bond to be given by the appointee and approve the same when given.''

If, and insofar as, these decisions infringe upon any statutory law[3] or, if, and insofar as, these decisions purport to give an appointment made by a majority of the individual supreme court justices any greater status than other valid appointments made by other responsible individuals who are specifically empowered to make such appointments by the terms of the trust instrument, they should, in my opinion, no longer be followed. It is not clear whether it was even the intent of these decisions to so hold, but, in view of the quoted language from these decisions I think we should modify such decisions to make it clear that, in case of such an appointment of a trustee by a majority of the supreme court justices as individuals, or by any other person empowered by the terms of a trust instrument to appoint successor trustees, while the circuit judge must ordinarily accept an appointment if the appointee is qualified, willing and able to serve as trustee, II *Scott on Trusts,* 3d ed. § 108.2 at 858; IV *Scott on Trusts,* 3d ed. § 388 at 2996-7; *Glader v. Schwinge,* 336 Ill. 551, 168 N.E. 658; 66 A.L.R. 172 (1929); *Hartman v. Orr,* 35 Ohio Abs. 528 41 N.E.2d 406 (1941); *Raffety v. Parker,* 241 F.2d 594 (8th Cir 1957); *In re Sotnikoff,* 34 N.J. Super. 422, 112 A.2d 754 (1955); 54 Am.Jur., *Trusts,* § 133 at 113; *Estate of Farrington,* 42 Haw. 640, nevertheless, such circuit judge is

---

[3] See §§ 637-2, H.R.S., subsection (2), giving circuit judges the power to hear and determine suits for the enforcement or regulation of trusts; § 554-1, H.R.S., giving the circuit judges, in cases of the valid appointment or succession of any trustee to fill a vacancy in any trusteeship, power to make a vesting order vesting legal title to the trust property "in the trustee so appointed".

in my opinion, empowered by law to review every such appointment for determination of at least the following:

1. To determine whether the appointment was made in accordance with the terms of the trust document; II *Scott on Trusts*, 2d ed. § 108.3; § 637-2(2), H.R.S.;

2. In cases where the qualifications of the trustee are set forth in the trust instrument, to determine if the appointee meets those qualifications; II *Scott on Trusts*, 3d ed., § 108.3; § 637-2(2), H.R.S.;

3. To determine the issue, where raised, of the mental competency or any incapacity of an appointee; II *Scott on Trusts*, 3d ed. § 108.3; *Bowditch v. Banuelos*, 1 Gray 220 (Mass. 1854).

4. To determine the amount of bond, if any is required, to be given by the appointee; § 607-21, H.R.S.

5. To make certain orders regarding the appointee's service as trustee so as to cause conflict of interests, if any, to be resolved as a condition to continued service as trustee; *Bogert Trusts and Trustees*, § 532; and

6. To determine any allegation that any such appointment violates a provision of the Constitution or the terms of a statute.

To the extent, if any, that *Estate of Bishop, supra,* holds to the contrary, it should no longer be the law, and I would so hold. From a reading of the pleadings, including the proposed amended complaint, I do not regard any of the above six items as having been raised as an issue in this case, except for item number six which was decided in this case, so I find no reversible error in the Circuit court's following of that decision in this case.